# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GLORIA E. SWANSON                          )
                                           )
               Plaintiff,          )     Civil Case No. **09 CV-2344**
                                           )
    v.                                   )
                                           )     Hon. Judge James B. Zagel
CITIBANK, N.A., ANDRE LANIER AND PCI       )
APPRAISAL SERVICES,                        )
                                           )
               Defendants.         )

**FILED**

10-22-2010

OCT 2 2 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFF GLORIA E. SWANSON'S
## <u>MOTION FOR RECUSAL</u>

NOW COMES, Gloria E. Swanson, Plaintiff pro se (hereinafter "Plaintiff" or "Swanson") and respectfully moves this Court for recusal of itself from this matter pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 and § 455(a). Plaintiff states as follows:

1.     On July 30, 2010, the Seventh Circuit Court of Appeals ruled on the appeal in *Gloria E. Swanson v. Citibank, N.A., et al.*, No. 10-1122 in an appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 09 C 2344, dismissal by James B. Zagel, Judge and "reversed the judgment of the district court insofar as it dismissed Swanson's Fair Housing Act discrimination claims against all three defendants, and affirmed insofar as it dismissed the common-law fraud claims against all three defendants. (Exh. A)

2.     There is strained bias and animus in this case due to statements made by this Court to Swanson and due to Swanson challenging the court reporter's transcripts which Swanson believes omitted crucial biased and inappropriate statements made to Swanson by the Court. Ordinarily, an allegation of judicial bias relates to bias against a party, not a party's attorney. *Charron v. U.S.*, 200 F.3d 785, 788-89 (Fed. Cir. 1999).

3.     The district court's court reporter, Ms. Blanca Lara, (hereinafter "Ms. Lara") signed and filed the Transcript Sheet relating to Swanson's appeal on or about January 26, 2010. In that Transcript Sheet, Ms. Lara stated that she would have the transcripts of the record of hearings in this matter dated June 16, 2009, July 21, 2009, October 16, 2009, December 17, 2009 and January 14, 2010 completed by March 10, 2010. The July 21, 2009 hearing was of particular interest to Swanson because this is the hearing where this Court made the statement to Swanson, *"You should have thought about that before you filed the lawsuit"*.

4.     The Fifth Circuit also found harmless error in an improper failure to recuse in *United States v. Jordan,*. 49 F.3d 152 (5th Cir. 1995). The court there found that the defendant's well-known, extremely antagonistic relationship with a close personal friend of the judge created an appearance of impropriety under section 455(a). That court upheld the defendant's conviction but vacated the sentence and remanded the case for resentencing by a different judge. This Court's court reporter is the equivalent of a "close personal friend" of this Court. As the Supreme Court has held, "opinions formed by the judge on the basis of facts introduced or events occurring in the court of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Such a display of antagonism has been displayed toward this Plaintiff by both the Court and its court reporter. *Liteky v. U.S.*, 510 U.S. 540 (1994) Therefore, Plaintiff cannot fairly obtain justice from this Court and its reporter.

5.     This Court's biased and inappropriate statement was brought up immediately after it was made in Plaintiff's July 30, 2009 filing of Plaintiffs' Response in Opposition to Defendant Citibank's Motion to Dismiss. This Court has denied making the statement. Plaintiff stands by

her allegation that the statement was, in fact, made. As an official court reporter herself, Plaintiff knows what was said and knows what she heard.

6.      At hearings on April 27 and April 28, 2010 related to Swanson's motion to correct the record since Ms. Lara's transcript of proceedings for the July 21, 2009 status hearing did not contain the statement in question, this Court stated that he had only made similar statements twice in his life and that he regretted each time, one being in a criminal case where the defendant was making a plea to the Judge regarding the impact sentencing would have on his family. When this Court denied Plaintiff's motion to correct the record on April 28, 2010, Ms. Lara turned to give Swanson a disparaging look.

7.      The purpose of a court reporter being present is to make a record in indelible ink. The tape recorders in court rooms are for "back-up" purposes only, used to back up the court reporter. The reliance is on the court reporter's machine shorthand notes, not on the tape recording. As history notes from Watergate, secretary Rosemary Woods erased pertinent portions of tape recordings of former President Richard Nixon's statements related to the 1973 Watergate break-in and conspiracy. Hence, tape recordings in a courtroom are not and should not be construed as the "official record" of the proceedings. The court reporter's notes taken down in indelible ink are the official record.

8.      Additionally, on May 5, 2010, Swanson requested and paid a $70.00 deposit to Ms. Lara toward the transcript of the two short hearings before Judge Zagel on April 27 and April 28, 2010 regarding Swanson's Motion to Correct the Transcript of July 21, 2009. Swanson has made numerous telephone calls to Ms. Lara regarding these transcripts. While Swanson understands that Ms. Lara was involved in a high-profile trial as Judge Zagel's court reporter beginning in June 2010, Ms. Lara did not even give Swanson the courtesy of a return telephone

**3**

call in response to a number of messages from Swanson regarding the April 27-28, 2010 transcripts. It has now been over five (5) months since Swanson paid for and requested the April 27-28, 2010 hearing transcripts from Ms. Lara. Ms. Lara cashed Swanson's $70.00 check but has not responded with either the transcripts or a promise as to when the transcripts will be forthcoming.

9    On August 5, 2010, after the ruling of the Appellate Court reversing the district court's dismissal of Swanson's FHA discrimination claim, Swanson wrote to Ms. Lara again asking for the transcripts for the April 27-28, 2010 hearings and advising Ms. Lara concerning the Appellate Court reversal. (Exh. B) Swanson also attached a copy of her cancelled check for $70.00 to the August 5, 2010 letter to Ms. Lara. Ms. Lara has still not responded as of this filing. Ms. Lara has treated Swanson with distain and unprofessionalism ever since Swanson challenged the accuracy of Ms. Lara's transcription of the July 21, 2009 status hearing in the district court case.

10.    Plaintiff has a right to question this Court's actual ability and impartiality in order to respond to the appearance of a lack of neutrality and in order to act to preserve in the public mind, the image of absolute impartiality and fairness of the judiciary. *United States of America v. John Torkington*, 874 F.2d 1441 (11th Cir. 1989).

11.    Bias or prejudice on the part of a judge may exhibit itself prior to a trial by acts or statements on his or her part. This Plaintiff stands by her allegations of the statements made by this Court at the July 21, 2009 status hearing. (Exh. C) The court reporter's notes are what constitute the record in this case, not a tape recording which is to be used as a court reporter's back up.

12.     Under 28 U.S.C. §455(a), a judge must recuse himself in any proceeding in which his impartiality might reasonably be questioned. This objective standard simply asks if a reasonable observer would perceive a "significant risk that the judge will resolve the case on a basis other than the merits". *Hooks v. McDade*, 89 F.3d 350, 354 (7th Cir. 1996); *United States v. Holland*, 655 F.2d 44 (5th Cir. 1981) (remarks by judge during trial may give rise to inference of bias or prejudice). If bias or prejudice is known to exist before the trial, it commands a review for disqualification of the judge to conduct the trial under 28 U.S.C., §144, *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir. 1956) In this instance, there are unusual circumstances relating to this Court, this Court's court reporter and this Plaintiff, where both for the judge's sake and the appearance of justice", *United States v. Schwartz*, 500 F.2d 1350, 1352 (2d Cir. 1974), an assignment to a different judge "is salutary and in the public interest, especially as it minimizes even a suspicion of partiality", *see* also, *United States v. Simon*, 393 F.2d 90, 91 (2d Cir. 1968). In such circumstances, a reassignment would not imply any personal criticism of the trial judge.

13.     Plaintiff fears that this Court may find it difficult to put aside views formed during earlier proceedings where Plaintiff accused (and still stands by her statement) the Court of making a biased statement in open court, where Plaintiff states that this Court's court reporter omitted that biased statement from the official transcript of July 21, 2009 and where this Court's court reporter has displayed such animus toward Plaintiff as to ignore telephone calls regarding an order for transcripts of the April 27 and April 28, 2010 hearing proceedings for which Plaintiff has paid said court reporter, Ms. Blanca Lara, and for which Ms. Lara has cashed the $70.00 check for that payment and for which Ms. Lara continues to ignore Plaintiff's request for said transcripts without even a mention of refunding Plaintiff's money.

14.     While this Court may legally rule on this motion for recusal, Plaintiff requests that this motion be transferred to another judge for ruling.

For the above reasons, Plaintiff respectfully requests that Plaintiff's motion for recusal and reassignment of this case to a different judge in the United States District Court for the Northern District of Illinois be granted.

Dated:  October 22, 2010

Gloria E. Swanson, Plaintiff, pro se

Gloria E Swanson, Plaintiff, pro se
**8920 S. Chappel Avenue**
Chicago, IL  60617
Email: Gswanson8920@aol.com
Tele. 773-731-6014-Fax:  773-731-0391
99500, pro se

6

# EXHIBITS

**Exhibits**

United States Court of Appeals for the Seventh Circuit
 Final Judgment, dated July 30, 2010
 Gloria E. Swanson v. Citibank, N.A., et al, 10-1122               A

Letter dated August 5, 2010 to Ms. Blanca Lara, Court Reporter
 From Gloria E. Swanson                        B

Affidavit of Gloria E. Swanson, dated October 22, 2010        C

**EXHIBIT A**
To Motion for Recusal

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 · 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

July 30, 2010

BEFORE:    FRANK H. EASTERBROOK, Chief Judge
                RICHARD A. POSNER, Circuit Judge
                DIANE P. WOOD, Circuit Judge

| No.: 10-1122 | GLORIA E. SWANSON, Plaintiff - Appellant |
| | v. |
| | CITIBANK, N.A., et al., Defendants - Appellees |

**Originating Case Information:**

District Court No: 1:09-cv-02344
Northern District of Illinois, Eastern Division
District Judge James B. Zagel

     Charles Routen is **DISMISSED** as a party on appeal. The judgment of the district court is **REVERSED** insofar as it dismissed Swanson's Fair Housing Act claims against all three defendants, and is **AFFIRMED** insofar as it dismissed the common-law fraud claims against all three defendants. Each side will bear its own costs on appeal. The above is in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment** (form ID: **132**)



In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1122

GLORIA E. SWANSON,

*Plaintiff-Appellant,*

*v.*

CITIBANK, N.A., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 2344—James B. Zagel, *Judge.*

SUBMITTED MAY 26, 2010*—DECIDED JULY 30, 2010

Before EASTERBROOK, *Chief Judge,* and POSNER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Gloria Swanson sued Citibank, Andre Lanier, and Lanier's employer, PCI Appraisal

---

* After examining the briefs and the record, we have concluded that oral argument is unnecessary. The appeal is therefore submitted on the briefs and the record. FED. R. APP. P. 34(a)(2)(C).

Services, because she believed that all three had discriminated against her on the basis of her race (African-American) when Citibank turned down her application for a home-equity loan. Swanson also named her husband, Charles Routen, as a co-plaintiff and a co-appellant, but since Swanson is proceeding *pro se*, she may not represent her husband. See FED. R. CIV. P. 11(a); *Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007). We have therefore dismissed Routen as a party on appeal; we proceed solely with respect to Swanson's part of the case. She was unsuccessful in the district court, which dismissed in response to the defendants' motion under FED. R. CIV. P. 12(b)(6).

Swanson based her complaint on the following set of events, which we accept as true for purposes of this appeal. *Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 986-87 (2010). In February 2009 Citibank announced a plan to make loans using funds that it had received from the federal government's Troubled Assets Relief Program. Encouraged by this prospect, Swanson went to a Citibank branch to apply for a home-equity loan. A representative named Skertich told Swanson that she could not apply alone, because she owned her home jointly with her husband; he had to be present as well. Swanson was skeptical, suspecting that Skertich's demand was a ploy to discourage loan applications from African-Americans. She therefore asked to speak to a manager. When the manager joined the group, Swanson disclosed to both Skertich and the manager that Washington Mutual Bank previously had denied her a home-equity loan. The manager warned Swanson that, although she

did not want to discourage Swanson from applying for the loan, Citibank's loan criteria were more stringent than those of other banks.

Still interested, Swanson took a loan application home and returned the next day with the necessary information. She was again assisted by Skertich, who entered the information that Swanson had furnished into the computer. When he reached a question regarding race, Skertich told Swanson that she was not required to respond. At some point during this exchange, Skertich pointed to a photograph on his desk and commented that his wife and son were part African-American.

A few days later Citibank conditionally approved Swanson for a home-equity loan of $50,000. It hired Andre Lanier, who worked for PCI Appraisal Services, to visit Swanson's home for an onsite appraisal. Although Swanson had estimated in her loan application that her house was worth $270,000, Lanier appraised it at only $170,000. The difference was critical: Citibank turned down the loan and explained that its conditional approval had been based on the higher valuation. Two months later Swanson paid for and obtained an appraisal from Midwest Valuations, which thought her home was worth $240,000.

Swanson saw coordinated action in this chain of events, and so she filed a complaint (later amended) charging that Citibank, Lanier, and PCI disfavor providing home-equity loans to African-Americans, and so they deliberately lowered the appraised value of her home far below its actual market value, so that they would have

an excuse to deny her the loan. She charges that in so doing, they violated the Fair Housing Act, 42 U.S.C. § 3605, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1). The district court granted the defendants' motions to dismiss both theories. It relied heavily on *Latimore v. Citibank Fed. Savings Bank*, 151 F.3d 712 (7th Cir. 1998), a case in which this court described the evidence required to defeat a defense motion for summary judgment on a credit discrimination claim. Initially, the court liberally construed Swanson's complaint to include a common-law fraud claim and declined to dismiss that aspect of the case. Later, however, the defendants moved to dismiss the fraud claim as well, and the district court granted the motion on the grounds that the statements on which Swanson relied were too indefinite and her reliance was unreasonable. This appeal followed.

Before turning to the particulars of Swanson's case, a brief review of the standards that apply to dismissals for failure to state a claim is in order. It is by now well established that a plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law. *Cf. Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), disapproved by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("after puzzling the profession for 50 years, this famous observation [the 'no set of facts' language] has earned its retirement"). The question with which courts are still struggling is how much higher the Supreme Court meant to set the bar, when it decided not only *Twombly*, but also

*Erickson v. Pardus*, 551 U.S. 89 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). This is not an easy question to answer, as the thoughtful dissent from this opinion demonstrates. On the one hand, the Supreme Court has adopted a "plausibility" standard, but on the other hand, it has insisted that it is not requiring fact pleading, nor is it adopting a single pleading standard to replace Rule 8, Rule 9, and specialized regimes like the one in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).

Critically, in none of the three recent decisions—*Twombly, Erickson*, or *Iqbal*—did the Court cast any doubt on the validity of Rule 8 of the Federal Rules of Civil Procedure. To the contrary: at all times it has said that it is interpreting Rule 8, not tossing it out the window. It is therefore useful to begin with a look at the language of the rule:

> (a) Claim for Relief. A pleading that states a claim for relief must contain:
>
> * * *
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . .

FED. R. CIV. P. 8(a)(2). As one respected treatise put it in 2004,

all that is necessary is that the claim for relief be stated with brevity, conciseness, and clarity . . . . [T]his portion of Rule 8 indicates that a basic objective of the rules is to avoid civil cases turning on tech-

nicalities and to require that the pleading discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the pleader's claim and a general indication of the type of litigation that is involved. . . .

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215 at 165-173 (3d ed. 2004).

Nothing in the recent trio of cases has undermined these broad principles. As *Erickson* underscored, "[s]pecific facts are not necessary." 551 U.S. at 93. The Court was not engaged in a *sub rosa* campaign to reinstate the old fact-pleading system called for by the Field Code or even more modern codes. We know that because it said so in *Erickson*: "the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* Instead, the Court has called for more careful attention to be given to several key questions: what, exactly, does it take to give the opposing party "fair notice"; how much detail realistically can be given, and should be given, about the nature and basis or grounds of the claim; and in what way is the pleader expected to signal the type of litigation that is being put before the court?

This is the light in which the Court's references in *Twombly*, repeated in *Iqbal*, to the pleader's responsibility to "state a claim to relief that is plausible on its face" must be understood. See *Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949. "Plausibility" in this context does not imply that the district court should decide whose version to

believe, or which version is more likely than not. Indeed, the Court expressly distanced itself from the latter approach in *Iqbal*, "the plausibility standard is not akin to a probability requirement." 129 S. Ct. at 1949 (quotation marks omitted). As we understand it, the Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen. For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences. Compare *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (applying PSLRA standards).

The Supreme Court's explicit decision to reaffirm the validity of *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), which was cited with approval in *Twombly*, 550 U.S. at 556, indicates that in many straightforward cases, it will not be any more difficult today for a plaintiff to meet that burden than it was before the Court's recent decisions. A plaintiff who believes that she has been passed over for a promotion because of her sex will be able to plead that she was employed by Company X, that a promotion was offered, that she applied and was qualified for it, and that the job went to someone else. That is an entirely plausible scenario, whether or not it describes what "really" went on in this plaintiff's case. A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations,

will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected. Finally, as the Supreme Court warned in *Iqbal* and as we acknowledged later in *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009), "abstract recitations of the elements of a cause of action or conclusory legal statements," 578 F.3d at 581, do nothing to distinguish the particular case that is before the court from every other hypothetically possible case in that field of law. Such statements therefore do not add to the notice that Rule 8 demands.

We realize that one powerful reason that lies behind the Supreme Court's concern about pleading standards is the cost of the discovery that will follow in any case that survives a motion to dismiss on the pleadings. The costs of discovery are often asymmetric, as the dissent points out, and one way to rein them in would be to make it more difficult to earn the right to engage in discovery. That is just what the Court did, by interring the rule that a complaint could go forward if any set of facts at all could be imagined, consistent with the statements in the complaint, that would permit the pleader to obtain relief. Too much chaff was moving ahead with the wheat. But, in other contexts, the Supreme Court has drawn a careful line between those things that can be accomplished by judicial interpretation and those that should be handled through the procedures set up in the Rules Enabling Act, 28 U.S.C. §§ 2071 et seq. See *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct.

599, 609 (2009). In fact, the Judicial Conference's Advisory Committee on Civil Rules is engaged in an intensive study of pleading rules, discovery practice, and the costs of litigation, as its recent 2010 Civil Litigation Conference, held at Duke Law School May 10-11, 2010, demonstrates. See Summary of 2010 Conference on Civil Litigation at Duke Law School, University of Denver Institute for the Advancement of the American Legal System, at http://www.du.edu/legalinstitute/pdf/DukeConference.pdf (last visited July 28, 2010).

Returning to Swanson's case, we must analyze her allegations defendant-by-defendant. We begin with Citibank. On appeal, Swanson challenges only the dismissal of her Fair Housing Act and fraud claims. The Fair Housing Act prohibits businesses engaged in residential real estate transactions, including "[t]he making . . . of loans or providing other financial assistance . . . secured by residential real estate," from discriminating against any person on account of race. 42 U.S.C. § 3605(a), (b)(1)(B). Swanson's complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through Skertich, the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home-equity loan). This is all that she needed to put in the complaint. See *Swierkiewicz*, 534 U.S. at 511-12 (employment discrimination); see also *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723-24 (6th Cir. 2010); *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 715 (9th Cir. 2009).

No. 10-1122

The fact that Swanson included other, largely extraneous facts in her complaint does not undermine the soundness of her pleading. She points to Citibank's announced plan to use federal money to make more loans, its refusal to follow through in her case, and Skertich's comment that he has a mixed-race family. She has not pleaded herself out of court by mentioning these facts; whether they are particularly helpful for proving her case or not is another matter that can safely be put off for another day. It was therefore error for the district court to dismiss Swanson's Fair Housing Act claim against Citibank.

Her fraud claim against Citibank stands on a different footing. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Of special relevance here, a plaintiff must plead actual damages arising from her reliance on a fraudulent statement. *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007). Without a contract, only out-of-pocket losses allegedly arising from the fraud are recoverable. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 274 (7th Cir. 1996) (applying Illinois law). Swanson asserts that Citibank falsely announced plans to make federal funds available in the form of loans to all customers, when it actually intended to exclude African-American customers from those who would be eligible for the loans. Swanson

relied, she says, on that false information when she applied for her home-equity loan. But she never alleged that she lost anything from the process of applying for the loan. We do not know, for example, whether there was a loan application fee, or if Citibank or she covered the cost of the appraisal. This is the kind of particular information that Rule 9 requires, and its absence means that the district court was entitled to dismiss the claim.

We now turn to Swanson's claims against Lanier and PCI. Here again, she pursues only her Fair Housing Act and fraud claims. (The appraisal defendants point out that they do not extend credit, and thus their actions are not covered in any event by the Equal Credit Opportunity Act, 15 U.S.C. § 1691a(e).) The Fair Housing Act makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . ." 42 U.S.C. § 3605(a). The statute goes on to define the term "residential real estate-related transaction" to include "the selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605(b)(2). There is an appraisal exemption also, found in § 4605(c), but it provides only that nothing in the statute prohibits appraisers from taking into consideration factors other than race or the other protected characteristics.

Swanson accuses the appraisal defendants of skewing their assessment of her home because of her race. It is unclear whether she believes that they did so as part of

a conspiracy with Citibank, or if she thinks that they deliberately undervalued her property on their own initiative. Once again, we find that she has pleaded enough to survive a motion under Rule 12(b)(6). The appraisal defendants knew her race, and she accuses them of discriminating against her in the specific business transaction that they had with her. When it comes to proving her case, she will need to come up with more evidence than the mere fact that PCI (through Lanier) placed a far lower value on her house than Midwest Valuations did. See *Latimore*, 151 F.3d at 715 (need more at the summary judgment stage than evidence of a discrepancy between appraisals). All we hold now is that she is entitled to take the next step in this litigation.

This does not, however, save her common-law fraud claim against Lanier and PCI. She has not adequately alleged that she relied on their appraisal, nor has she pointed to any out-of-pocket losses that she suffered because of it.

We therefore REVERSE the judgment of the district court insofar as it dismissed Swanson's Fair Housing Act claims against all three defendants, and we AFFIRM insofar as it dismissed the common-law fraud claims against all three. Each side will bear its own costs on appeal.

POSNER, *Circuit Judge*, dissenting in part. I join the majority opinion except with respect to reversing the dismissal of the plaintiff's claim of housing discrimination. I have difficulty squaring that reversal with *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), unless *Iqbal* is limited to cases in which there is a defense of official immunity—especially if as in that case it is asserted by very high-ranking officials (the Attorney General of the United States and the Director of the FBI)—because the defense is compromised if the defendants have to respond to discovery demands in a case unlikely to have merit. *Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009); Robert G. Bone, "Plausibility Pleading Revisited and Revised: A Comment on *Ashcroft v. Iqbal*," 85 *Notre Dame L. Rev.* 849, 882 (2010); Howard M. Wasserman, "*Iqbal*, Procedural Mismatches, and Civil Rights Litigation," 14 *Lewis & Clark L. Rev.* 157, 172-73 (2010).

The majority opinion does not suggest that the Supreme Court would limit *Iqbal* to immunity cases. The Court said that "our decision in *Twombly* [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the forerunner of *Iqbal*] expounded the pleading standard for 'all civil actions.'" 129 S. Ct. at 1953. It did add that a district judge's promise of minimally intrusive discovery "provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." *Id.* at 1954. But this seems just to mean that the Court thought *Iqbal* a strong case for application of the *Twombly* standard, rather

than thinking it the only type of discrimination case to which the standard applies.

There is language in my colleagues' opinion to suggest that discrimination cases are outside the scope of *Iqbal*, itself a discrimination case. The opinion says that "a plaintiff who believes that she has been passed over for a promotion because of her sex will be able to plead that she was employed by Company X, that a promotion was offered, that she applied and was qualified for it, and that the job went to someone else." Though this is not a promotion case, the opinion goes on to say that "Swanson's complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through Skertich, the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home equity loan). This is all that she needed to put in the complaint." In contrast, "a more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected." The "more complex" case to which this passage is referring is *Twombly*, an antitrust case. But *Iqbal*, which charged the defendants with having subjected Pakistani Muslims to harsh conditions of confinement because of their religion and national origin, was a discrimination case, as is the present case, and was not especially complex.

Suppose this *were* a promotion case, and several people were vying for a promotion, all were qualified, several

were men and one was a woman, and one of the men received the promotion. No complexity; yet the district court would "draw on its judicial experience and common sense," *Ashcroft v. Iqbal, supra*, 129 S. Ct. at 1950, to conclude that discrimination would not be a plausible explanation of the hiring decision, without additional allegations.

This case is even stronger for dismissal because it lacks the competitive situation—man and woman, or white and black, vying for the same job and the man, or the white, getting it. We had emphasized this distinction, long before *Twombly* and *Iqbal*, in *Latimore v. Citibank Federal Savings Bank*, 151 F.3d 712 (7th Cir. 1998), like this a case of credit discrimination rather than promotion. "Latimore was not competing with a white person for a $51,000 loan. A bank does not announce, 'We are making a $51,000 real estate loan today; please submit your applications, and we'll choose the application that we like best and give that applicant the loan.'" *Id.* at 714. We held that there was no basis for an inference of discrimination. *Noland v. Commerce Mortgage Corp.*, 122 F.3d 551, 553 (8th Cir. 1997), and *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1558 (5th Cir. 1996), rejected credit-discrimination claims because there was no evidence that similar applicants were treated better, and *Boykin v. Bank of America Corp.*, 162 Fed. App'x 837, 840 (11th Cir. 2005) (per curiam), rejected such a claim because "absent direct evidence of discrimination, there is no basis for a trier of fact to assume that a decision to deny a loan was motivated by discriminatory animus unless the

plaintiff makes a showing that a pattern of lending suggests the existence of discrimination."

There is no allegation that the plaintiff in this case was competing with a white person for a loan. It was the low appraisal of her home that killed her chances for the $50,000 loan that she was seeking. The appraiser thought her home worth only $170,000, and she already owed $146,000 on it (a first mortgage of $121,000 and a home-equity loan of $25,000). A further loan of $50,000 would thus have been undersecured. We must assume that the appraisal was a mistake, and the house worth considerably more, as she alleges. But errors in appraising a house are common because "real estate appraisal is not an exact science," *Latimore v. Citibank Federal Savings Bank, supra,* 151 F.3d at 715—common enough to have created a market for "Real Estate Appraisers Errors & Omissions" insurance policies. See, e.g., OREP (Organization of Real Estate Professionals), "E&O Insurance," www.orep.org/appraisers-e&o.htm (visited July 11, 2010). The Supreme Court would consider error the plausible inference in this case, rather than discrimination, for it said in *Iqbal* that "as between that 'obvious alternative explanation' for the [injury of which the plaintiff is complaining] and the purposeful, invidious discrimination [the plaintiff] asks us to infer, discrimination is not a plausible conclusion." *Ashcroft v. Iqbal, supra,* 129 S. Ct. at 1951-52, quoting *Twombly,* 550 U.S. at 567.

Even before *Twombly* and *Iqbal,* complaints were dismissed when they alleged facts that refuted the plaintiffs' claims. See, e.g., *Tierney v. Vahle,* 304 F.3d 734, 740

(7th Cir. 2002); *Thomas v. Farley,* 31 F.3d 557 (7th Cir. 1994); *Lightner v. City of Wilmington,* 545 F.3d 260, 262 (4th Cir. 2008). Under the new regime, it should be enough that the allegations render a claim implausible. The complaint alleges that Citibank was the second bank to turn down the plaintiff's application for a home-equity loan. This reinforces the inference that she was not qualified. We further learn that, subject to the appraisal, which had not yet been conducted, Citibank had approved the $50,000 home-equity loan that the plaintiff was seeking on the basis of her representation that her house was worth $270,000. But she didn't think it was worth that much when she applied for the loan. The house had been appraised at $260,000 in 2004, and the complaint alleges that home values had fallen by "only" 16 to 20 percent since. This implies that when she applied for the home-equity loan her house was worth between $208,000 and $218,400—much less than what she told Citibank it was worth.

If the house was worth $208,000, she would have owed a total of $196,000 had she gotten the loan, or just a shade under the market value of the house. If the bank had insisted that she have a 20 percent equity in the house, which would be $41,600, it would have lent her only $20,400 ($166,400—80 percent of $208,000—minus the $146,000 that she already owed on the house). The loan figure rises to $28,720 if the house was worth $218,400 rather than $208,000. In either case a $50,000 loan would have been out of the question, especially in the wake of the financial crash of September 2008, when credit, including home-equity credit, became extremely tight. E.g., Bob

Tedeschi, "Opening the Tap on Home Equity," *N.Y. Times*, Nov. 7, 2008, p. RE9, www.nytimes.com/2008/11/02/realestate/02mort.html. For it was a home-equity loan that the plaintiff was seeking in early February of 2009, at the nadir of the economic collapse—and seeking it from troubled Citibank, one of the banks that required a federal bailout in the wake of the crash. Financial reports in the weeks surrounding the plaintiff's application make clear the difficulty of obtaining credit from Citibank during that period. See Binyamin Appelbaum, "Despite Federal Aid, Many Banks Fail to Revive Lending," *Wash. Post*, Feb. 3, 2009, www.washingtonpost.com/wp-dyn/content/article/2009/02/02/AR2009020203338_pf.html ("some of the first banks to get funding, such as Citigroup and J.P. Morgan Chase, have reported the sharpest drops in lending"); Liz Moyer, "Banks Promise Loans but Hoard Cash," *Forbes.com*, Feb. 3, 2009, www.forbes.com/2009/02/03/banking-federal-reserve-business-wall-street-0203_loans.html ("banks and other lenders have tightened access to credit and are conserving capital in order to absorb the losses that occur when borrowers default,' the company [Citibank] said: 'Citi will not and cannot take excessive risk with the capital the American public and other investors have entrusted to the company'"); Mara Der Hovanesian & David Henry, "Citi: The Losses Keep Coming," *Bloomberg BusinessWeek*, Jan. 12, 2009, www.businessweek.com/bwdaily/dnflash/content/jan2009/db20090112_136301.htm?campaign_id=rss_daily ("banks are not lending. They are using every opportunity to pull loans and force liquidations"). (All web sites were visited on July 11, 2010.)

In *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam), decided two weeks after *Twombly*, the Supreme Court, without citing *Twombly*, reinstated a prisoner's civil rights suit that had been dismissed on the ground that the allegations of the complaint were "conclusory." The suit had charged deliberate indifference to the plaintiff's need for medical treatment. In the key passage in the Court's opinion, we learn that "the complaint stated that Dr. Bloor's decision to remove the petitioner [that is, the plaintiff] from his prescribed hepatitis C medication was 'endangering [his] life.' It alleged this medication was withheld 'shortly after' petitioner had commenced a treatment program that would take one year, that he was 'still in need of treatment for this disease,' and that the prison officials were in the meantime refusing to provide treatment. *This alone was enough to satisfy Rule 8(a)(2)*. Petitioner, in addition, bolstered his claim by making more specific allegations in documents attached to the complaint and in later filings" (emphasis added, record citations omitted). It was reasonable to infer from these allegations, assuming their truth, that the defendants (who included Dr. Bloor, a prison doctor) had acted with deliberate indifference to the petitioner's serious medical need by refusing to provide him with any medical treatment after taking away his medication. Indeed it's difficult (again assuming the truth of the allegations) to imagine an alternative interpretation. Hepatitis C is a serious disease and the prisoner had been put in a treatment program expected to last a year. To refuse him any treatment whatsoever seemed (as the other allegations to which the Court referred confirmed) to be puni-

tive. I think *Erickson* is good law even after *Iqbal*, but I also think it's miles away from a case in which all that's alleged (besides pure speculation about the defendants' motive) is that someone was denied a loan because her house is mistakenly appraised for less than its market value.

The majority opinion relies heavily on *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), cited with approval in *Twombly,* see 550 U.S. at 556 (though not cited in *Iqbal*) and not overruled. Although it is regarded in some quarters as dead after *Iqbal,* e.g., *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009); Suja A. Thomas, "The New Summary Judgment Motion: The Motion to Dismiss Under *Iqbal* and *Twombly,*" 14 *Lewis & Clark L. Rev.* 15, 35 (2010), lower-court judges are not to deem a Supreme Court decision overruled even if it is plainly inconsistent with a subsequent decision. *State Oil Co. v. Khan,* 522 U.S. 320 (1997); *Agostini v. Felton,* 521 U.S. 203, 237 (1997); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989); *National Rifle Ass'n v. City of Chicago,* 567 F.3d 856, 857-58 (7th Cir. 2009), reversed under the name *McDonald v. City of Chicago,* 2010 WL 2555188 (U.S. June 28, 2010). But that principle is not applicable here; *Swierkiewicz* is distinguishable.

The Court rejected a rule that the Second Circuit had created which required "heightened pleading" in Title VII cases. The basic requirement for a complaint ("a short and plain statement of the claim showing that the pleader is entitled to relief") is set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 9 requires height-

ened pleading (that is, a specific allegation) of certain elements in particular cases, such as fraud and special damages. There is no reference to heightened pleading of discrimination claims, however, and *Swierkiewicz* holds that the judiciary is not authorized to amend Rule 9 without complying with the procedures in the Rules Enabling Act. 534 U.S. at 513-15; *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168-69 (1993); Saritha Komatireddy Tice, Note, "A 'Plausible' Explanation of Pleading Standards: *Bell Atlantic Corp. v. Twombly,*" 31 *Harv. J.L. & Pub. Pol'y* 827, 832 n. 49 (2008). As the Court explained in *Twombly, "Swierkiewicz* did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules." 550 U.S. at 570. But Title VII cases are not exempted by *Swierkiewicz* from the doctrine of the *Iqbal* case. *Iqbal* establishes a general requirement of "plausibility" applicable to all civil cases in federal courts.

It does so, however, in opaque language: "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." 129 S. Ct. at 1949. In statistics the range of probabilities is from 0 to 1, and therefore encompasses "sheer possibility" along with "plausibility." It seems (no stronger word is possible) that what the Court was driving at was that even if the district judge doesn't think a plaintiff's case is more likely than not to be a winner (that is, doesn't think p > .5), as long as it is substantially justified that's enough to avert dismissal. Cf. Equal Access to Justice Act, 28

U.S.C. § 2412(d)(1)(A). But when a bank turns down a loan applicant because the appraisal of the security for the loan indicates that the loan would not be adequately secured, the alternative hypothesis of racial discrimination does not have substantial merit; it is implausible.

Behind both *Twombly* and *Iqbal* lurks a concern with asymmetric discovery burdens and the potential for extortionate litigation (similar to that created by class actions, to which Rule 23(f) of the civil rules was a response, *Isaacs v. Sprint Corp.*, 261 F.3d 679, 681 (7th Cir. 2001); *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834-35 (7th Cir. 1999); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162-65 (3d Cir. 2001); *Vallario v. Vandehey*, 554 F.3d 1259, 1263 (10th Cir. 2009); Fed. R. Civ. P. 23(f) Committee Note) that such an asymmetry creates. *Ashcroft v. Iqbal, supra*, 129 S. Ct. at 1953; *Bell Atlantic Corp. v. Twombly, supra*, 550 U.S. at 557-59; *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009); *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046-47 (9th Cir. 2008). In most suits against corporations or other institutions, and in both *Twombly* and *Iqbal*—but also in the present case—the plaintiff wants or needs more discovery of the defendant than the defendant wants or needs of the plaintiff, because the plaintiff has to search the defendant's records (and, through depositions, the minds of the defendant's employees) to obtain evidence of wrongdoing. With the electronic archives of large corporations or other large organizations holding millions of emails and other electronic communications, the cost of discovery to a defendant has become in many cases astronomical. And the cost

is not only monetary; it can include, as well, the disruption of the defendant's operations. If no similar costs are borne by the plaintiff in complying with the defendant's discovery demands, the costs to the defendant may induce it to agree early in the litigation to a settlement favorable to the plaintiff.

It is true, as critics of *Twombly* and *Iqbal* point out, that district courts have authority to limit discovery. *E.g., Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008); *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995); *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir. 1984); *Mwani v. Bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005). But especially in busy districts, which is where complex litigation is concentrated, the judges tend to delegate that authority to magistrate judges. And because the magistrate judge to whom a case is delegated for discovery only is not responsible for the trial or the decision and can have only an imperfect sense of how widely the district judge would want the factual inquiry in the case to roam to enable him to decide it, the magistrate judge is likely to err on the permissive side. "One common form of unnecessary discovery (and therefore a ready source of threatened discovery) is delving into ten issues when one will be dispositive. A magistrate lacks the authority to carve off the nine unnecessary issues; for all the magistrate knows, the judge may want evidence on any one of them. So the magistrate stands back and lets the parties have at it. Pursuit of factual and legal issues that will not matter to the outcome of the case is a source of enormous unnecessary costs, yet it is one hard to conquer in a system of notice pleading and even harder to limit when

an officer lacking the power to decide the case supervises discovery." Frank H. Easterbrook, "Discovery as Abuse," 69 B.U. L. Rev. 635, 639 (1989); see also Milton Pollack, "Discovery—Its Abuse and Correction," 80 F.R.D. 219, 223 (1979); Virginia E. Hench, "Mandatory Disclosure and Equal Access to Justice: The 1993 Federal Discovery Rules Amendments and the Just, Speedy and Inexpensive Determination of Every Action," 67 Temple L. Rev. 179, 232 (1994).

This structural flaw helps to explain and justify the Supreme Court's new approach. It requires the plaintiff to conduct a more extensive precomplaint investigation than used to be required and so creates greater symmetry between the plaintiff's and the defendant's litigation costs, and by doing so reduces the scope for extortionate discovery. If the plaintiff shows that he can't conduct an even minimally adequate investigation without limited discovery, the judge presumably can allow that discovery, meanwhile deferring ruling on the defendant's motion to dismiss. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc); *Coss v. Playtex Products, LLC*, No. 08 C 50222, 2009 WL 1455358 (N.D. Ill. May 21, 2009); Edward A. Hartnett, "Taming *Twombly*, Even After *Iqbal*," 158 U. Pa. L. Rev. 473, 507-14 (2010); Suzette M. Malveaux, "Front Loading and Heavy Lifting: How Pre-Dismissal Discovery Can Address the Detrimental Effect of *Iqbal* on Civil Rights Cases," 14 Lewis & Clark L. Rev. 65 (2010). No one has suggested such a resolution for this case.

The plaintiff has an implausible case of discrimination, but she will now be permitted to serve discovery de-

mands that will compel elaborate document review by Citibank and require its executives to sit for many hours of depositions. (Not that the plaintiff is capable of conducting such proceedings as a pro se, but on remand she may—indeed she would be well advised to—ask the judge to help her find a lawyer.) The threat of such an imposition will induce Citibank to consider settlement even if the suit has no merit at all. That is the pattern that the Supreme Court's recent decisions are aimed at disrupting.

We should affirm the dismissal of the suit in its entirety.

**EXHIBIT B**
To Motion for Recusal

August 5, 2010


Ms. Blanca Lara
Court Reporter
219 S. Dearborn St. #2504
Chicago, IL 60604

     Re:    Gloria E. Swanson v. Citibank, et al, 09 cv 02344

Dear Ms. Lara:

    On May 5, 2010, I sent a check to you in the amount of $70.00 asking that the hearings on April 27, 2010 and on April 28, 2010 related to my Motion to Correct the Record be transcribed. While I know that you have been busy with a large trial, I ask that you please complete and send to me these transcriptions. My check No. 8963 was cashed by you months ago.

    As you know, this case went to the Appeals Court in the Seventh Circuit. The Appellate Court has reversed in part, reversing the Judge's dismissal of my discrimination claims against Citibank and Andre Lanier. I will need the aforementioned transcripts for other motions and for the continuance of my discrimination case in the district court.

    You can reach me during the day at 312-701-7514 or at home at 773-731-6014. Thank you.

           Very truly yours,


           Gloria E. Swanson
           8920 S. Chappel Avenue
           Chicago, IL 60617-2919
           Gswanson8920@aol.com



EXHIBIT
B
tabbies

# EXHIBIT C
**To Motion for Recusal**

# AFFIDAVIT OF GLORIA E. SWANSON

I, Gloria E. Swanson, being first duly sworn, on oath deposes and states that:

1.     My name is Gloria E. Swanson. I reside at 8920 S. Chappel Avenue, Chicago, Illinois 60617. I am 61 years of age.

2.     I am the Plaintiff in a cause of action in the United States District Court for the Northern District of Illinois entitled *Gloria E. Swanson v. Citibank, N.A., Andre Lanier and PCI Appraisal Services*, No. 09 CV 2344.

3.     The above-referenced case was appealed in the Seventh Circuit Court of Appeals and ruled on as *Gloria E. Swanson v. Citibank, N.A., et al.*, No. 10-1122 in an appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 09 C 2344, dismissal by Judge James B. Zagel. The Seventh Circuit Court of Appeals "reversed the judgment of the district court insofar as it dismissed Swanson's Fair Housing Act discrimination claims against all three defendants, and affirmed insofar as it dismissed the common-law fraud claims against all three defendants.

4.     At a status hearing held on July 21, 2009 in the above-referenced district court case No. 09-CV-2344, Judge Zagel stated to Plaintiff Swanson, *"You should have thought about that before you filed the lawsuit"*, in response to my open court statement that someone from Citibank had made an "under-the-radar" telephone call to my place of employment after I filed the above lawsuit as if in an effort to back me off of the lawsuit because Citibank is a client of the law firm I am employed by. That statement by Judge Zagel is not included in the court reporter's transcript of the July 21, 2009 proceedings.

5.     I have contacted Judge Zagel's court reporter, Ms. Blanca Lara, beginning on May 5, 2010 in order to obtain transcripts of the Motion to Correct Record hearings in this case held on April 27, 2010 and April 28, 2010 while this case was in appeal. On May 5, 2010, I paid

1



Ms. Lara $70.00 as and for either full payment of or a deposit on the transcription of these short hearings, depending upon the ultimate page count.

6.     Since May 5, 2010, I have left numerous voice messages to Ms. Lara regarding the transcription of the April 27-28, 2010 motion to correct record hearings which messages have been ignored. Ms. Lara cashed my $70.00 check and still continues to ignore my requests for these transcripts.

7.     On August 5, 2010, I again wrote to Ms. Lara and included a copy of my cancelled check to her dated May 5, 2010, advising her that the Appellate Court case had been decided and partially reversed and remanded back to the district court. I again asked for the April 27-28, 2010 hearing transcripts. Ms. Lara did not respond to that letter either and continues to this day, five (5) months after my initial request and payment for these transcripts, to ignore me and my requests.

FURTHER THE AFFIANT SAYETH NOT.

Gloria E. Swanson

Subscribed and sworn to before me this
22nd day of October, 2010

Notary Public

"OFFICIAL SEAL"
RUBY MORALES
Notary Public, State of Illinois
My Commission Expires April 02, 2014

2